ARMED SERVICES BOARD OF CONTRACT APPEALS

| | |
|---|---|
| Appeals of -- ) | |
| ) | |
| Clean by Lucy, Inc. ) | ASBCA Nos. 58432, 58441, 58442 |
| ) | |
| Under Contract No. W9124M-05-D-0014 ) | |

APPEARANCE FOR THE APPELLANT:     Leonard W. Childs, Jr., Esq.
                                  Childs & Associates
                                  Savannah, GA

APPEARANCES FOR THE GOVERNMENT:   Raymond M. Saunders, Esq.
                                  Army Chief Trial Attorney
                                  CPT Megan E. Mahaney, JA
                                  Trial Attorney[1]

OPINION BY ADMINISTRATIVE JUDGE THRASHER

These appeals arise from Clean by Lucy, Inc. (CBL), performing 31 task orders (TOs) under an Indefinite-Delivery/Indefinite-Quantity (ID/IQ) contract in support of the renovation and modernization of barracks on Fort Stewart, Georgia. On 17 September 2012, CBL filed 17 appeals with the Board. Fourteen of the appeals were decided under the Board's expedited procedures (Rule 12.2) in our decision on 14 June 2013 (ASBCA No. 58331 *et al.*). Our decision in the expedited appeals has no precedential value. Therefore, we are not bound by that decision or our findings of fact in that decision. However, we consider it reasonable that the evidentiary record produced in arriving at that decision, including the transcript of the first hearing, under the circumstances involved with these appeals, be considered part of the evidentiary record in the instant appeals. The evidentiary record from that decision involved a hearing on 6 and 7 May 2013 that produced a two-volume hearing transcript; a Rule 4 file; and a stipulation of fact between the parties regarding authority of Mr. Terrence Johnson. The Rule 4 file in the first set of appeals, as supplemented, is the same Rule 4 as in the instant appeals. Much of evidence produced at the first hearing directly addresses issues found in these three appeals. However, the parties have withdrawn the stipulation of fact regarding Mr. Johnson's authority entered into during the first hearing. Consequently, it is not part of the record in these appeals. A hearing was held and only entitlement is at issue. The Board has jurisdiction over the dispute pursuant to the Contract Disputes Act (CDA) of 1978, 41 U.S.C. §§ 7101-7109.

---

[1] At various times during these appeals, the government was also represented by MAJ Joseph K. Venghaus, JA, Erica S. Beardsley, Esq., MAJ James P. Leary, JA, and MAJ Ildiko Szentkiralyi, JA.

# FINDINGS OF FACT

1. Fort Stewart and Hunter Army Airfield, Georgia, were notified in 2005 that a large group of Army troops were scheduled to return from operations in Iraq within 90 days and would be billeted at Fort Stewart and Hunter Army Airfield. At the time, Fort Stewart and Hunter Army Airfield did not have the existing capacity to house these troops in existing barracks. Although there were several empty barracks on the bases, the barracks required substantial renovation before they would be habitable. As a result, this mission imperative generated a requirement for Fort Stewart and Hunter Army Airfield to renovate 33 existing barracks within 90 days to accommodate the returning troops. This project was generally referred to as the barracks reset project (reset project).[2]

2. Rather than contracting with a single general contractor to manage the overall reset project, the government chose to manage the reset project directly by employing an acquisition strategy where the government would contract directly with individual contractors for specific segments of the renovation project, such as heating and cooling, painting, flooring, etc. (tr. 2/152-55; R4, tab 1 at 2).[3] As a result, the government assumed responsibility for scheduling the various contractors and managing any scheduling conflicts between the contractors that might arise. In this regard, the solicitation pertinent to these appeals (and subsequent contract) incorporated by reference FAR 52.236-8, OTHER CONTRACTS (APR 1984), which put CBL on notice that other contractors might be working within the same area of their work (R4, tab 1 at 450).

3. The government issued invitations for bids to perform the various segments of the barracks reset project. Pertinent to these appeals, was a solicitation for an ID/IQ contract, to provide services for the removal and installation of floor coverings for the buildings at Fort Stewart and Hunter Army Airfield (flooring contract). The flooring contract was structured for a one-year period with four option periods and was a competitive 8(a) set aside. (R4, tab 1 at 1, 3, 78, 153, 228, 303)

4. By 2005, United Grounds Maintenance (UGM) had approximately 20 years of experience performing small government contracts at Fort Stewart and Hunter Army Airfield (ASBCA No. 58331 et al. (58331), tr. 1/107-08). However, this was UGM's first bid on an ID/IQ contract and on any contract of this magnitude (58331, tr. 1/78). At that time, CBL was a small business specializing in cleaning and was owned by Ms. Lucy Brown. Although CBL was already certified by the Small Business

---

[2] This background information is undisputed and the record support is throughout the transcripts of both hearings.

[3] Unless otherwise noted citation to transcripts are for the hearing in ASBCA Nos. 58432, 58441, 58442.

2

Administration (SBA) as a minority, woman-owned 8(a) contractor, this was its first bid on a government contract (tr. 1/175). After reviewing the solicitation for the flooring contract, Mr. Jerry Burkhalter, a UGM representative, approached Ms. Brown proposing that the two businesses work together to compete for Solicitation No. W9124M-05-B-0006-0004 (tr. 1/175-76).[4] Ms. Brown agreed with the proposal and a bid was submitted by CBL (R4, tab 1 at 3).

*Site Visit*

5. On 13 July 2005 CBL participated with other potential bidders in a pre-bid site visit. The potential bidders were driven around Fort Stewart and Hunter Army Airfield to view various buildings (tr. 2/45, 52-54). However, the potential bidders were not told of the reset project during the site visit (tr. 2/50).

*Contract Award*

6. CBL bid and was awarded Contract No. W9124M-05-D-0014 on 26 July 2005. The contract required CBL to provide an indefinite quantity of various services related to the buildings at Fort Stewart and Hunter Army Airfield, including the removal of the existing floor covering and replacement with new vinyl tile. (R4, tab 1 at 3, 264)

*Contract Authority to Administer CBL's Performance under the TOs*

7. The government issued a notice of award letter on 28 July 2005 that, among other things, identified the contracting officer (CO), contracting officer's representative (COR) and the contract administrator. Ms. Deborah Austin was designated the CO and the letter stated she was the only individual with authority to bind the government. (R4, tab 264) Mr. Joey Waters was appointed the COR and Mr. Terrence Johnson the contract administrator (*id.* at 2). Pertinent to these appeals, Mr. Johnson signed every TO and virtually every TO modification as the "CONTRACTING/ORDERING OFFICER" (R4, tabs 5-31). In addition, he was on the worksite with CBL virtually every day providing direction and resolving issues as part of his responsibilities in administering the TOs (tr. 2/167). Mr. Johnson was also responsible for ensuring CBL submitted the proper paperwork to be paid (58331, tr. 2/144-45).

---

[4] The precise legal relationship between CBL and UGM resulting from their agreement is unclear. CBL's proposal is not in the record and the awarded contract does not mention UGM. However, CBL filed the underlying claim in these appeals as a subcontractor sponsorship claim with UGM's attached request for equitable adjustment (REA) stating it is a subcontractor to CBL (R4, tab 257 at 1-5). Likewise, CBL's notice of appeal describes UGM as "an interested subcontractor" (Bd. corr.).

8. Mr. Burkhalter was the project superintendent for CBL and was delegated authority to act on behalf of the company (R4, tab 2; 58331, tr. 1/109). Mr. Burkhalter directed the work on a day-to-day basis and interacted with Mr. Johnson and Mr. Waters at the worksites. Ms. Tammy Wilds[5] was CBL's chief administrative officer and among other responsibilities prepared invoices and associated documents for payment (58331, tr. 1/26-27). She prepared all the invoices and associated documents submitted for payment under all 30 TOs at issue and signed as a witness for Ms. Lucy Brown's signature on all payment releases submitted (58331, tr. 1/41-51).

*Issuance of Task Orders*

9. All work under the contract was performed pursuant to bilateral TOs (R4, tab 1 at 452). The contract provided for a structured, orderly procedure for awarding TOs under the contract that anticipated the parties would negotiate the TO requirements within the parameters of the contract. This process, known as "scoping," would begin by informing the contractor in writing of an anticipated requirement, a site visit would be conducted and the parties would negotiate a TO for the work to be performed. (R4, tab 1 at 379-80) Paragraph 2.1 of the Technical Provisions, stated that "[a]s the need exist [sic] for performance under the terms of this contract, the Contracting Officer or his/her authorized representative will notify the Contractor, in writing, of an existing requirement" (R4, tab 1 at 379). The contract further stated that within two working days of receiving written notification of a requirement from the CO or an authorized representative, appellant would conduct a site visit, establish "verbal contact with the Contracting Officer or his/her representative to further define the scope of the requirement," then submit a proposal to the government (R4, tab 1 at 379-80, ¶ 2.2.2). The contract anticipated the government and contractor would meet to measure the rooms where the work would be performed and determine which line items applied. The parties would then negotiate the requirement and then a requirements request would be generated and a TO issued. (58331, tr. 1/139-41) However, because of the compressed schedule demands of the project, the orderly process for negotiating and awarding TOs under the contract was impossible and was never implemented. No proposals were requested by the government nor were any proposals submitted by CBL on the barracks reset project (tr. 2/132-33). Although there was no "scoping", the government entered the date of the pre-award potential bidder's site visit, 13 July 2005, on every TO as the date of the scoping meeting, which was 12 days before the award of the contract on 26 July 2005 (58331, tr. 1/161).

10. Nine days after award, on 4 August 2005, the government began issuing the 30 TOs to CBL for the removal of existing floor coverings and the replacement with new vinyl tile in all single solider barracks located at Fort Stewart. The TOs relevant to

---

[5] Ms. Wilds was Ms. Tammy Price at the time of this contract (58331, tr. 1/46).

the instant appeals are TO Nos. 0001-0028, 0031, and 0032 (58432, tr. 2/184).[6] The majority of TOs were quickly issued in successive groups in early August 2005; 29 of the 31 TOs were issued between 4 August 2005 and 12 August 2005.[7] The last two were TO 0026, Building 634, which was issued on 23 September 2005 and TO 0028, Building 636, which was issued on 30 November 2005. Each TO corresponded to a barracks building to be renovated and established both the work to be performed as well as a period of performance for that specific task.
(R4, tabs 5-31, 34, 35, 64, 110)

11. The contract included FAR 52.216-19, ORDER LIMITATIONS (OCT 1995) that stated in pertinent part:

> (b) Maximum order. The Contractor is not obligated to honor:
>
> (1) Any order for a single item in excess of $500,000;
>
> (2) Any order for a combination of items in excess of $500,000; or
>
> (3) A series of orders from the same ordering office within 10 calendar days that together call for quantities exceeding the limitation in subparagraph (1) or (2) above.

(R4, tab 1 at 452) TOs 1-25, 27, 31 and 32[8] were issued within a 10-calendar day period with a face value in excess of $1 million. Despite the fact CBL was not required to accept these orders under the contract, all were bilaterally executed. (R4, tabs 5-30, 34-35)

12. The barracks were three stories tall and contained various numbers of units in various combinations and modules. In total, the TOs related to work in 2,412 separate housing units, requiring approximately 800,000 square feet of floor covering. The total work was required to be completed in a period of 90 days and was undertaken in conjunction with a number of other contractors working on the reset

---

[6] The parties stipulated during the hearing that TO Nos. 0001-0028, 0031 and 0032 are relevant to ASBCA Nos. 58432 and 58441, while only TO Nos. 0009, 0022, 0023, and 0032 are relevant to ASBCA No. 58442 (tr. 2/184).

[7] 4 August 2015 (3 TOs), 3 August 2015 (2 TOs), 8 August 2015 (6 TOs), 9 August (4 TOs), 10 August 2015 (9 TOs), 11 August 2015 (3 TOs) and 12 August (2 TOs).

[8] TO 26 was issued on 23 September 2005 and TO 28 was not issued until 30 November 2005 (R4, tabs 64, 110).

5

project such as HVAC maintenance, furniture moving, cleaning and painting. (58331, tr. 1/37; R4, tab 257 at 4)

*Performance of the Work*

13. Ms. Austin testified that issuance of the first TO constituted notice to proceed on the reset project (tr. 1/55). Consequently, work began on 4 August 2015 and the individual TOs included specific periods of performance staggered to accomplish the total work within the 90-day reset deadline (R4, tabs 5-30, 34-35, 64, 110).

14. Although the government was aware of the barracks reset project at the time of the solicitation, it did not inform CBL of the project until after award (58331, tr. 1/111; 58432, 2/152-55). Ms. Wilds testified that CBL was the last contractor issued TOs on the barracks reset project because they would be the last contractor working on each site, due to the coordination of the scheduling of all the other contractors on site. CBL began to hear from other contractors about the overall scope of the reset project after contract award. It was not until the pre-construction meeting on 9 August 2015, after award and the first TOs were already issued, that the government provided CBL any information on the barracks reset project. (Tr. 2/152-55)

ASBCA No. 58432: Acceleration–Reduction of Number of Days

15. Contract clause 52.000-4039, TIME ALLOWED FOR COMPLETION OF TASK ORDERS (4 DEC 02), provided a formula to assist in determining a suggested timeframe for completion of a TO (R4, tab 1 at 438). The equation contained in clause 52.000-4039 stated that the total days recommended as a guideline for "estimating Task Order completion time" was 30-days, plus (0.00009 x the task order price in dollars), plus any extra days determined by the government to be necessary (*id.*). Clause 52.000-4039, at paragraph a, also stated that "[t]his formula is for information only and may be used by the Government as a guideline for estimating Task Order completion time, along with other factors. Performance time will be negotiated for each Task Order." (R4, tab 1 at 438) Ms. Austin testified that the performance periods were negotiated. However, she was not actually involved in issuing the TOs and her testimony on this point appears to be based upon the fact each of the TOs were executed as bilateral agreements, signed by Mr. Burkhalter. (Tr. 1/52-54) In contrast, Ms. Wilds testified there was no negotiation between the parties about the performance period as contemplated by the contract (tr. 2/146-47). We find Ms. Wilds' testimony credible and supported by the record. The record establishes the TO performance periods were developed by the government to accommodate the 90-day deadline; the TO performance periods were staggered to meet the 90-day deadline, with the majority of performance periods being 10 days per barracks (TO).[9] We find the performance periods were not negotiated but were unilaterally issued by the government.

---

[9] The initial TOs 0001-0003, issued on 4 August 2005, included a 14-day performance

6

16. A pre-performance meeting was held on 9 August 2005. Among the attendees at that meeting were Mr. Johnson, Ms. Wilds, Mr. Burkhalter and Ms. Brown. (R4, tabs 3, 4) Mr. Burkhalter testified that during the meeting he told the government representatives that they "[were not] anticipating 31 barracks at one time, or this much work" and the government's response by Mr. Johnson was the "troops were coming home, and we had to get this job done, you know. Whatever we had to do, just do it." (58331, tr. 1/123-24) Likewise, Ms. Wilds testified that during the meeting CBL discussed how challenging the schedule would be and the government's response:

> We talked about the fact that we were going to have to work around the clock to get this work accomplished, and that we were going to have to hire new people, because our crew, our normal crew, couldn't perform this much work this fast, and that's when we were told that we knew that this was a lot, that the troops were coming home, and this was the first phase of this contract, and it had to be completed on time because the troops had to have somewhere to live when they got home, so to go to work and get it done.

(Tr. 2/138-39) She did not raise the issue of the performance period with the CO but did so with both Mr. Johnson and Mr. Waters (tr. 2/150). The government did not present any evidence to rebut Mr. Burkhalter's and Ms. Wilds' testimony regarding notice to the government on this issue.

ASBCA No. 58441: Transport and Storage of Materials

17. Unlike most of the other contractors on site, CBL was required to meet several material storage requirements (tr. 2/39). Ms. Wilds explained in her testimony that the nature of the flooring work required special storage mandated by the product's manufacturer to meet the requirements of the contract just to protect the materials from the elements and prepare them for installation (tr. 2/38-39). The contract Technical Provisions provided detailed storage and installation compliance requirements for the installation of flooring (R4, tab 1 at 387-434). The sections applying to installation of resilient flooring and carpet required that the materials be stored in accordance with manufacturer's recommendations (R4, tab 1 at 389, ¶ 1.4, at 396, ¶ 1.3). The manufacturer's recommendations required the materials be acclimatized to the area

---

period for each; TO 0005, issued on 5 August 2005, included a 26-day performance period; TO 0007, issued on 8 August 2005, included a performance period of 40 days; and TO 0031, issued on 12 August 2005, included a performance period of 27 days.

7

where the flooring would be installed. Ms. Wilds explained how meeting the acclimatization requirements during the reset project presented unique challenges because of the "large quantity of the work at one time," contrasting this project with all other work they had performed before and after, stating:

> Q Where do you store materials generally? On the job order contracting that you had before, how did you go about handling that?
>
> ....
>
> A It's really hard to compare the two, because prior to this barracks task and after this barracks task, we have never had anything that was similar to this. We performed this same contract until the very end. We've never had anything similar to this arise.
>
> Before we worked on this contract, when we were under the basic ordering agreement, we never had this. All the materials --
>
> Q What is "this" that you're talking about?
>
> A This large quantity of work at one time. Prior to this, under the basic ordering agreement, everything was one building at a time. You order your materials. They come into your warehouse. You take them to the job site. You leave them for 48 hours, 72 hours, whatever the manufacturer recommends for them to be climatized to that building, and then you come in and install them.
>
> After this rush barracks thing was over, we performed 199 more task orders. I mean, I'm not sure exactly, but there was -- it was 200 task orders. It was never like this again. Always the materials come in for one or two buildings, whatever you've got to be going on. You take -- they come into your warehouse. You take them to the job site, and you climatize them to the building.
>
> With this, we had two or three trucks, semi trucks, a day coming in, bringing materials. They had to be taken to our warehouse in Glennville, and brought here....

....

A  When you brought these materials by the trailer
to the job site, in order to get that much material into the
building to be climatized in the amount of time that you
needed, the materials needed to have been here the day
before.  But we couldn't have them here the day before,
because our truck was back and to from Glennville.

So when you're thinking about how many buildings
you're doing at one time, if you had a site -- an on-site
warehouse, you could bring your materials there.  You
could take them directly to the building and get them
climatized, in the amount of time that you had.  With the
materials being off site, you had to bring them here, throw
them in the building, and hope to God they got climatized
before it was time to put them down.

(Tr. 2/27-29)

18.  The contract states that the "[c]ontractor shall coordinate use of the site for access, staging, and parking with the Contracting Officer" (R4, tab 1 at 381, ¶ 5.9). The contract also incorporates by reference FAR clause 52.236-10, OPERATIONS AND STORAGE AREAS (APR 1984), which requires CO approval to store materials, including temporary buildings, on government premises (R4, tab 1 at 450).  Ms. Wilds and Mr. Burkhalter directed the request to store materials on site to Mr. Johnson and Mr. Waters shortly after award.  Ms. Wilds described that meeting and the response they received as follows:

[W]e explained that we were going to be getting truckloads
of material in at the time, and we explained that we didn't
have a semi truck and trailer to haul the materials down
here, and we asked if we could rent one of those containers
and put down here, a storage container and put down here.
And Joey Waters looked around and said, We've got so
much going on at all these buildings, there's not anywhere
to put it.

And he said, you know, We've got all the different
contractors; the furniture movers are moving in and out.
We can't get in their way.  We've got the painting

9

contractors are out here. You know, there's just too much activity in the area for you all to sort materials here.

And Jerry said, Well, you know, we're going to have to haul these back and to. And Joey said, Well, I understand that, but that's what's going to have to be done because we cannot allow you to store this. There's nowhere for you to go.

(Tr. 2/36)

19. Ms. Wilds also testified that, as a result of their request being denied, CBL was required to store the materials several miles[10] away at CBL's warehouse facility in Glennville, Georgia. This required having the materials delivered to the warehouse and then making several trips a day back and forth to Fort Stewart. This also necessitated acquiring a tractor-trailer truck, hiring a driver and locating an employee at the warehouse to transport the materials to Fort Stewart. (Tr. 2/36-37)

ASBCA No. 58442: Access to Buildings: 629, 631, 632 and 633[11]

20. The barracks were referred to as "pinwheel barracks" because they were designed and constructed in a non-linear modular fashion with a courtyard surrounded by three to four towers. Each floor within the towers had an exterior landing with four rooms per landing. These landings were not enclosed at the time of this contract. (Tr. 2/84) CBL was required to remove the existing flooring in each room, dispose of the debris and then bring in the new materials to rooms to lay the new flooring. Ms. Wilds testified that CBL's bid strategy was to adapt a forklift to directly access the exterior landings on each floor, thereby reducing the labor required and expediting debris removal and delivery materials to the rooms. This approach was successfully used on every barracks except buildings 629, 631, 632, and 633. (Tr. 2/60-61)

21. Ms. Wilds also testified there were many contractors simultaneously performing work on the barracks in the same areas where CBL was working. In most cases CBL was able to work around other contractors working in the same area except in the case of buildings 629 (TO 22), 631 (TO 32), 632 (TO 23) and 633 (TO 9) where another contractor (pipeline contractor) was renovating the high pressure water lines servicing the barracks. The pipeline contractor was staging equipment and materials in the area and had dug a series of trenches next to these buildings. Ms. Wilds estimated the trenches were approximately six to eight feet wide and eight to ten feet deep. (Tr. 2/59)

---

[10] Glennville, Georgia, is approximately 25 miles from Fort Stewart.
[11] This claim is also referred to as the Government Failure to Cooperate claim.

22. During her testimony, Ms. Wilds referred in detail to three maps to explain why CBL could not use a forklift to access the exterior landings because of the pipeline contractor (exs. G-1, A-1, A-2).[12] She explained that a main road ran in front of these barracks but the barracks were back from the road. However, a forklift could gain access to the buildings by entering one of the parking lots next to the buildings, jumping a curb and driving through a grassy area next to the building to access the landings. The only other option for direct access to the building was to use an access road that ran behind the buildings. (Tr. 2/57-59; ex. G-1) Ms. Wilds testified their forklift could only access building 629 from one of two parking lots because of the configuration of building. One parking lot was blocked because the pipeline contractor was using it as a staging area for its materials and equipment and the other lot was blocked by the work (trenches) being performed by the pipeline contractor. In the case of buildings 631, 632 and 633, Ms. Wilds testified that access to the buildings was blocked by the pipeline trenches because they completely surrounded the buildings. (Tr. 2/117-19) As a result, CBL's forklift could not access the landings in buildings 629, 631, 632, and 633 because of a combination of the layout of the barracks and the pipeline contractor working in the same area.

23. The government relied solely upon the testimony of Mr. Carl Steen to refute Ms. Wilds' testimony. At the time of his testimony, Mr. Steen was the Chief of the Contract Construction Branch at Fort Stewart, responsible for all construction on the base (tr. 2/82). Mr. Steen testified that he was familiar with the buildings at issue and, using a current utilities map of the area (ex. G-1; R4, tab 284), opined whether CBL would have been prevented from accessing each building with a forklift. Mr. Steen testified that only one side of building 629 would have been blocked by excavation of the high-temperature water lines, that only a maximum of two sides of building 631 would have been blocked by excavation of the high-temperature water lines and only one side of building 632 would have been blocked by excavation of the high-temperature water lines. (Tr. 2/91-92)

24. Although Mr. Steen testified as to facts and his opinions, Mr. Steen admitted that he was not present at Fort Stewart during the performance of this contract and was not involved with the project. In addition, he was not qualified as an expert witness by the government during the hearing. (Tr. 2/99-100, 102-03) Consequently, we disregard the opinions expressed by Mr. Steen. On the other hand, we find Ms. Wilds' testimony credible and find CBL was unable to access the buildings with their forklift because of the activities of the pipeline contractor.

25. Ms. Wilds also testified that this issue was never directly raised to the CO but it was raised with Mr. Johnson and Mr. Waters. Both men came out to the site in response to notice of the problem to try and determine if there was another way to gain

---

[12] Exhibit G-1 is a blow-up copy of Rule 4, tab 284.

access to the buildings. After inspecting the site, they could not find another point of access for the forklift. (Tr. 2/78, 121-22) The government then told CBL, "just keep doing what [you are] doing, and try to get some more people so that we [can] speed it up, and let's finish and get out of [this] area, because we're bogged down" (tr. 2/122). As a result, CBL hired more people and was forced to hand carry debris out of the buildings and bring materials into the buildings by carrying them up the stairs in the buildings (tr. 2/120). The government did not attempt to refute Ms. Wilds' testimony on these points. Consequently, we find that CBL notified the government of their inability to gain access to the buildings with their forklift and was directed by the government to continue with the work manually and to hire more people to compensate in an attempt to speed up the work. Additionally, the government did not proffer any evidence of what, if any, actions the government took to try and prevent the pipeline contractor from interfering with CBL's performance. The final progress reports show the work on these buildings was completed by 10 December 2005 (R4, tabs 111, 153, 162, 164).[13]

*Payment Invoices and Releases*

26. CBL submitted a payment invoice for every TO at issue in the instant appeals (R4, tabs 97-98, 103, 108-09, 123-24, 195-209, 213, 218, 234-39). A TO was issued for all work on a specific building and the TO related to all work performed on the identified building. The contract included local clause 52.000-4005, INVOICE CONSTRUCTION (29 JUL 03) which states, in pertinent part, that the invoices should be submitted to an office at Fort Stewart and the "[i]nvoices shall cite the contract number, delivery/task order number (if applicable), contract line item/subline item numbers, quantity, price and total amount of invoice. Contractor shall furnish the required certification/release IAW FAR 52.232-5 (c)/(h), 'Payments Under Fixed-Price Construction Contracts.'" (R4, tab 1 at 443) Each invoice was forwarded for payment as part of a package that included two other documents, a general release and a certification (58331, tr. 1/152-53). Each of the documents, the invoice, the release and certification, were separate documents (58331, tr. 1/155). The certificate addressed two separate issues; it certified that the person signing the payment release was authorized to bind the company and provided a certification required by FAR 52.232-5(c) for any request for progress payments under a fixed-price construction contract.[14]

---

[13] Bldg. 629, 18 November 2005; Bldg. 631, 30 November 2005; 632, 26 November 2005; and Bldg. 633, 10 December 2005.

[14] FAR clause 52.232-5(c) requires a certification that: "(1) The amounts requested are only for performance in accordance with the specifications, terms, and conditions of the contract; (2) All payments due to subcontractors and suppliers from previous payments received under the contract have been made, and timely payments will be made from the proceeds of the payment covered by

27. The general release was required by FAR 52.232-5(h)(3) that states in pertinent part that a request for final payment must include a, "release of all claims against the Government arising by virtue of this contract, other than claims, in stated amounts, that the Contractor has specifically excepted from the operation of the release." The payment invoice form includes a statement that a "'Contractor's Release' statement MUST be completed *before* FINAL PAYMENT under this contract will be made." In fact, each final payment invoice submitted by CBL included an attached general final payment release of claims (payment release) that stated it was the "CONTRACTOR'S RELEASE STATEMENT UNDER CONTRACT: W9124M05D0014." (R4, tab 218 at 1, 4) The language of each general release followed the same form:

> In consideration of the premise and the sum of
> $_____ lawful money of the United States of
> America (hereinafter called the "Government")
> $_____ of which has already been paid and
> $_____ of which is to be paid by the
> Government under the above-referenced contract, the
> undersigned Contractor does, and by the receipt of said
> sum, shall for itself, its successors and assigns, remise,
> release and forever discharge the Government, its officers,
> agents, and employees, of and from all liabilities,
> obligations, and claims whatsoever in law and in equity
> under or arising out of said contract.

(*Id.* at 4)

28. Ms. Wilds prepared all the invoice documents for Ms. Brown's signature. She explained that all her previous experience with contracts at Fort Steward involved payment by submitting a company invoice, most being paid by government credit card because of the low dollar value of the contracts. Consequently, this was her first experience preparing and submitting invoices to the Defense Finance and Accounting Service (DFAS) and she was not familiar with the forms. (58331, tr. 1/47; 58432, tr. 2/157-58) Because of her unfamiliarity with the required forms, Ms. Wilds worked closely with Mr. Johnson on all the invoices and payment releases were submitted as instructed by Mr. Johnson (58331, tr. 1/47).

---

this certification, in accordance with subcontract agreements and the requirements of chapter 39 of Title 31, United States Code; and (3) This request for progress payments does not include any amounts which the prime contractor intends to withhold or retain from a subcontractor or supplier in accordance with the terms and conditions of the subcontract."

13

29. Ms. Wilds testified that the first invoice she prepared did not include the release form or certification and was rejected; Mr. Johnson told her they had to be included for the invoice to be paid (58331, tr. 1/46; 58432, tr. 2/168). She also explained why all invoices were labeled "final" despite the fact the first seven invoices filed were for interim payment, not final payment, indicating a remaining balance due after payment (R4, tabs 97-98, 103, 108-09, 123-24).[15] These, she explained, were paid and labeled final but showed a remaining balance because they were actually interim payments to provide the contractor money because of financial strain on cash flow (tr. 1/125-26, 131). These invoices were submitted in late 2005, with the last two, buildings 632 and 633 being submitted on 30 December 2005 (R4, tabs 97-98, 103, 108-09, 123-24). All the remaining invoices, except TO 33 (Bldg. 280) were submitted in January and February 2006 (R4, tabs 195-209, 213, 218, 234-39). Ms. Wilds explained that all invoices were labeled final because of specific direction from Mr. Johnson that the billings must be designated as "final" or they would not be processed for payment (58331, tr. 1/72-73).

30. All payment release documents submitted under the reset project, at issue in this appeal, referenced the overall ID/IQ contract but not a specific associated TO. Although not part of this claim, the record indicates the first invoice submitted for payment under the contract on the reset project was for carpet installation in Building 1129 at Hunter Airfield, which lists both the contract and the associated TO (R4, tab 40). Ms. Wilds' unrebutted testimony indicates she was instructed to include the contract number by Mr. Johnson (58331, tr. 1/48-49).

31. Ms. Austin testified that she prepared the Rule 4 file and that the final payment invoices and payment releases were placed in the Rule 4 file as they were found in the contract files (58331, tr. 1/170-71). She explained that although the invoices and payment releases were photocopied together for the Rule 4 file, they were separate stand-alone documents (tr. 1/148). Ms. Austin testified that the only way to identify which specific TO was associated with a particular payment release was by the dollar amounts stated on the TO but conceded it is possible there could be amounts on invoices that are identical (58331, tr. 1/154-55; 58432, tr. 1/160). All the amounts stated in the releases correlated to the amounts invoiced for each TO with the exception of TO 6 (Bldg. 717), where no amount was stated (R4, tab 97). In addition, the final payment invoices and payment releases submitted for TOs 25 and 27 reflect identical amounts invoiced (R4, tabs 108-09). Ms. Austin did not testify directly about her understanding of the effect of all the releases; she was only asked about a specific release associated with TO 0003, which she considered to be the final release of claims for that TO (58331, tr. 1/144-45).

---

[15] The record does not include an invoice filed by CBL for the remaining balance indicated on these initial invoices.

14

32. All payment releases at issue were executed by Ms. Brown, as CBL's president, and Ms. Wilds,[16] as witness to Ms. Brown's signature. Upon review of the language contained in the releases, Ms. Brown testified that her reading of the document indicated that "once I signed this, this is what they pay me, and the Government doesn't owe me anything else" (tr. 1/205). However, later when asked if it was her understanding at the time of signing the release whether she was releasing any claims, she stated, "No, sir. I was under the impression that they were partial payments." (Tr. 1/211) Ms. Brown also testified that while she never intended to release claims on any of the TOs, that she did not "necessarily go through reading" the releases before she signed them "if Tammy [Ms. Wilds] said, This is an invoice we need to sign, I glanced over it, looked at the amount, and signed" (*id.*). Ms. Brown further testified that she never asked the government any questions regarding the releases, "except to find out what it was" (tr. 1/213). Ms. Wilds also testified that she was aware of the release language but only considered the requests for payment to be submittals for progress payments, not a release of all claims that might be due CBL (58331, tr. 1/51).

33. Mr. Johnson's testimony confirmed that as the ordering officer he was responsible for ensuring CBL submitted invoices for final payment, to review the invoices to ensure the work invoiced was complete, and to forward to DFAS to make sure CBL was paid. He also did not consider the final payment paperwork to release any claims but to be a payment mechanism. (58331, tr. 2/144-45) Although each final payment invoice was signed by Mr. Johnson as checked for administrative compliance, each was authorized for payment by the CO (R4, tabs 97-98, 103, 108-09, 123-24, 195-209, 213, 218, 234-39).[17]

*Modification Releases*

34. The government issued written modifications to the TOs as work progressed. The modifications generally fell into three categories: added work to be performed; were administrative in nature (e.g., corrected mistakes, added or subtracted funds etc.); or partially terminated the TOs to reconcile the contract record with the work actually performed.

35. Between 21-28 September 2005 all the TOs were modified to incorporate additional work (R4, tabs 60-62, 64-88, 90-93). The additional work included such items as, installing skim coat on the floors and removing existing items and replacing them, such as gypsum wall board, insulation, deteriorated metal framing, and wood. In addition, each modification included a time extension to accommodate the

---

[16] Ms. Wilds signed the release documents as Ms. Tammy Price, her name at the time.

[17] Four of the first seven invoices filed were authorized for payment by Mr. Jerry Cox (R4, tabs 97-98, 108-09). The remainder were authorized by Ms. Austin.

15

additional work. Each of the modifications adding additional work included a release, stating:

> Release of claims: In consideration of the modification
> agreed to herein as completed and equitable adjustments
> for the additional work required above, the contractor
> hereby releases the government from any and all liability
> under this contract for further equitable adjustment
> attributable to such facts or circumstances giving rise to the
> aforesaid changes without exception.

(*Id.*)

36. Performance of the work on all TOs was essentially completed by 30 November 2005. Between 25 January and 20 April 2006 modifications were issued to reconcile the contract records with the work actually completed on all the TOs except TO 0009 (R4, tabs 78-88, 90-93, 96, 110, 181-94, 210-12, 214-17, 241, 250, 256). These modifications were no cost partial terminations of the work under the TOs adjusting the quantities and funds associated with each TO. Each of these modifications included a release, stating:

> Release of claims: In consideration of the modification
> agreed to herein as completed and equitable adjustments
> for the termination required above, the contractor hereby
> releases the government from any and all liability under
> this contract for further equitable adjustment attributable to
> such facts or circumstances giving rise to the aforesaid
> changes without exception.

(*Id.*)

*CBL's Claims*

37. Although the exact time is unclear, Ms. Wilds testified that throughout performance CBL would complain to Mr. Johnson and Mr. Waters about the three issues that gave rise to these appeals and they were assured by them that it would be addressed at the end of the contract (tr. 2/163-64). Ms. Austin testified she was not aware of possible claims until 6 October 2005 during a meeting held to discuss various issues (tr. 1/109; R4, tabs 100-01). CBL informed Ms. Austin by letter on 3 January 2006 of its intention to file a claim under the contract but no specific issues were identified (R4, tab 125). It was not until 9 August 2011 that CBL filed a request for equitable adjustment (REA) asserting 17 claims totaling $1,461,913.20 and including a CDA certification (R4, tab 257). Among the claims were the three at issue in the

16

instant appeal: CBL sought $399,728 arising from the government's alleged reduction in the number of days allowed under the contract to complete required work under individual TOs (Acceleration Claim) (*id.* at 21-22); $81,718.80 associated with the transport and storage of floor coverings (Transportation and Storage Claim) (*id.* at 43-45); and $111,893.40 for extra costs incurred as a result of alleged interference by the government's pipeline contractor (Access to Buildings Claim) (*id.* at 45-49).

*Contracting Officer's Final Decision (COFD)*

38. Ms. Austin responded to CBL's claim with a COFD on 13 August 2012, denying CBL's claim in its entirety based upon the fact CBL had requested final payment on all TOs, with an executed final release included with each request, and that, "[n]o proposal by the Contractor for an equitable adjustment shall be allowed if asserted after final payment under this contract" (R4, tab 258 at 1).

39. CBL filed its notice of appeal by letter dated 17 September 2012 and was initially docketed as ASBCA No. 58331. CBL's complaint identified 17 factually distinct claims. Accordingly, all claims were assigned discrete appeal numbers but consolidated under ASBCA No. 58331 as ASBCA Nos. 58331, 58429-58444. On 11 February 2013, CBL elected to proceed under Board Rule 12.2, Small Claims (Expedited) procedure, on all appeals except ASBCA Nos. 58432, 58441 and 58442. A hearing was held on the expedited appeals on 6 and 7 May 2013 and a decision rendered on 14 June 2013 (ASBCA No. 58331 *et al.*). The remaining three appeals are addressed in this decision.

## DECISION

*Do the Payment Releases Bar Appellant's Claims?*

The government argues appellant invoiced for final payment on all 31 TOs and each submittal included a general release, executed by CBL, and as a result all outstanding claims under the 31 TOs are barred by release (gov't br. at 1). Our findings establish appellant invoiced for payment on all 31 TOs and each submittal included a general release. However, seven of the invoices, submitted from 3 October 2005 through 30 December 2005, were not requests for final payment (findings 26, 29).

A release is a contract whereby a party abandons a claim or relinquishes a right that could be asserted against another and must be interpreted in the same manner as any other contract term or provision. Consequently, our examination begins with the plain language of the payment releases to determine the intent of the parties and extrinsic or parol evidence of the parties' intent may only be examined if the plain language of the release is ambiguous. *Bell BCI Co. v. United States*, 570 F.3d 1337, 1341 (Fed. Cir. 2009).

17

Although the parties assert the plain language of the release documents are unambiguous, they differ in their interpretation of the scope of the releases. The government argues that each release is a part of the payment submittal and, if viewed within the context of all the documents within the invoice package, unambiguously evidences an intent to release any claims associated with the TO referenced in the payment invoice. As a result, the government interprets the language of the releases that refers to all claims "under or arising out of said contract" to refer to the TO not the basic contract. (Gov't reply br. at 5) In the alternative, the government argues that if the term "contract" in the phrase "under or arising out of said contract" only refers to the basic contract, such language is broad enough to encompass TOs as "under or arising out of" the basic contract. Consequently, execution of any one of the releases would preclude appellant from entitlement on any of its claims. (*Id.* at 8 n.4)

Appellant also argues that the language of the releases are unambiguous; they only reference the basic contract with no mention of a TO (app. reply br. at 18). In other words, appellant interprets the phrase "under or arising out of said contract" to refer to the only contract referenced, i.e., the basic contract. In support of this interpretation, appellant distinguishes between claims involving issues under the said basic contract and those relating to issues under the TOs:

> Appellant was additionally convinced -- and remains convinced -- that none of its original claims and/or its remaining claims addressed issues arising out of the IDIQ Base Contract. Rather, Appellant's claims arose from the work and effort expended in performance of individual Task Orders.

> In large measure the IDIQ Base Contract was the Unit Price Schedule establishing unit prices applying to the various categories of Task Order work. Given the complete absence of any claims relating to the IDIQ Base Contract, i.e., claims relating to unit prices, audit issues, funding, and/or other administrative matters or details, Appellant was willing to execute and submit a "Contractor's Release Statement Under Contract No. W9124M05D0014," i.e. the IDIQ Base Contract, consistent with the format demanded by the Government at the direction of Mr. Johnson. Indeed, matters and concerns arising from the IDIQ Base Contract simply **were not** issues for claim. Appellant was therefore able to comply with the Government 's insistence on the inclusion of a Contractor's Release Statement of the IDIQ Base Contract with each Task Order invoice submitted for payment while

still retaining its right to make claims for additional work under those existing Task Orders.

(App. reply br. at 20-21) (Citations omitted)

Appellant also argues that the TOs are separate documents and, therefore, are extrinsic evidence that may not be used to interpret the unambiguous releases (app. reply br. at 19). Likewise, appellant rejects the government's argument that the release document should be interpreted within the context of the total invoice submittal packages noting that the release document is a stand-alone document and to consider the related documents would be to impermissibly consider extrinsic evidence to interpret an unambiguous document (*id.*).

The evidence supports appellant's position that our examination should be focused upon the releases as stand-alone documents and contradicts one of the government's proposed interpretations of the release language. Each payment request included three separate documents, the invoice, the contractor's release and a certification that the signatory possessed the authority to bind the company by the release and progress payment representations (finding 26). Although these documents were prepared and submitted together as a package, the CO's uncontroverted testimony established each document was a stand-alone document and there was no way to identify the release associated with the other documents in the package without correlating the amount listed in the release with an associated invoice. She also stated that it is possible some TOs might include identical amounts, which is the case in at least two of the TOs. (Finding 31)

Contrary to both parties' arguments, we conclude the releases are ambiguous. Examination of the release documents in isolation reveals their scope is ambiguous. The releases state in pertinent part that,

> [T]he undersigned Contractor does, and by the receipt of said sum, shall for itself, its successors and assigns, remise, release and forever discharge the Government, its officers, agents, and employees, of and from all liabilities, obligations, and claims whatsoever in law and in equity under or arising out of said contract.

(Finding 27) The only contract identified on the face of the release is the basic contract (finding 30). The parties have proposed two different interpretations of the scope of the phrase "under or arising out of said contract" (included in each release) that are within the zone of reasonableness given a plain reading of the language. *States Roofing Corp. v. Winter*, 587 F.3d 1364, 1369 (Fed. Cir. 2009). If a contract is susceptible to more than one reasonable interpretation, as here, it is ambiguous. *Hills*

19

*Materials Co. v. Rice*, 982 F.2d 514, 516 (Fed. Cir. 1992). Given the release language is ambiguous we examine the extrinsic evidence to ascertain the parties' intent. *Bell BCI*, 570 F.3d at 1341.

Our examination of the evidence leads us to reject appellant's argument that the releases were intended to only release the contract, not the work performed under the TOs (app. br. at 11-18). Instead, we conclude the 31 release documents were filled out and executed for submittal with an invoice for payment on each TO as found in the record based upon both Ms. Austin's testimony related to how she prepared the Rule 4 file and Ms. Wilds' testimony related to how she prepared and submitted the invoices and attached documents for payment (findings 28-31).

As a rule, a general release, whether associated with final payment or not, which is not qualified on its face, bars any claims based upon events occurring before execution of the release. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387 (Fed. Cir. 1987). Appellant responds that release is an affirmative defense and, in this instance, the government has "failed in its burden" in proving the general releases were knowingly and intentionally executed to relinquish CBL's rights to outstanding claims related to work under the TOs (app. supp. br. at 9-10). We conclude the government has met its burden of showing a prima facie case of release. The government has established that appellant executed unqualified releases in relation to every TO. Additionally, our findings confirm the contract provided notice to appellant that it could specifically reserve any claims from the general release (finding 27). Despite this, appellant's execution of the releases were unqualified, i.e., there was no express reservation of claims. Consequently, the burden shifts to appellant of proving any exceptions to release and exceptions to release are strictly construed against the contractor. *Mingus*, 812 F.2d at 1394. Exceptions to release include: fraud, mutual mistake; economic duress, *Rumsfeld v. Freedom NY, Inc.*, 329 F.3d 1320, 1329 (Fed. Cir. 2003) and, consideration of a claim after execution of the release. *Konitz Contracting, Inc.*, ASBCA No. 53433, 02-1 BCA ¶ 31,845 at 157,364 (citing *J.G. Watts Construction Co. v. United States*, 161 Ct. Cl. 801, 807 (1963)). There is no evidence in the record to support the exceptions of fraud, mutual mistake, economic duress or consideration of any claims after execution of the release.

Appellant argues in its supplemental brief, in the alternative, that the releases are ambiguous and consideration of the extrinsic evidence establishes that, "the intent of the Parties was to get the Appellant paid" and there was no "intent whatsoever to effect releases of claims" (app. supp. br. at 6). We understand appellant's argument to raise the issue of the existence of evidence of a pre-release understanding of reservation of claims. We have recognized that a release might not be binding where the conduct of one party led the other party to believe its claims would be considered after execution of a release. *JDV Construction Inc.*, ASBCA No. 37937, 89-3 BCA ¶ 22,012 at 110,665; *Able Products Co.*, ASBCA No. 24221, 80-2 BCA ¶ 14,733 at 72,693 (government oral

20

assurance claim would be processed after release was signed) (citing *Julius Goldman's Egg City v. United States*, 556 F.2d 1096 (Ct. Cl. 1977)). However, this exception requires that specific identifiable claims exist prior to execution of the release and that some conduct on the part of the government leads the contractor to believe its claims will be considered after execution of the release. Neither of these two prerequisites exist in the record of the instant appeals.

Reservation of a claim does not require the existence of a perfected claim but it does require more than a lone statement of intent to assert a claim. *Mingus*, 812 F.2d at 1394-95. Appellant proffered evidence that when appellant questioned the government during performance about the actions forming the basis of these appeals, Mr. Johnson and Mr. Waters responded that the work had to be completed and these issues would be addressed at the end of the contract (finding 37). The CO testified that the first time she became aware there might be any claims was at the 6 October 2005 meeting but no specific claims were identified at that time. Appellant's only express notice that it intended to file any claims was its January 2006 letter. However, that letter only stated an intent to file claims, there were no specifics regarding the potential claims. (Finding 37) The fact that Mr. Johnson and Mr. Waters may have suspected appellant might file claims or the notice to the CO of appellant's "intent" to file claims are not specific enough to meet the legal standard to preserve appellant's claims after executing the releases.

Additionally, even if there were an existing claim prior to executing the releases, appellant has also failed to carry its burden to prove conduct by the government that would lead appellant to reasonably conclude its future claims would not be barred by execution of the releases. Our findings establish that appellant, Ms. Brown and Ms. Wilds, did not intend the releases to bar its claims but instead considered the release a necessary step in obtaining payment (finding 32). Clearly, a pre-release understanding cannot be based upon a contractor's intent alone. *Mingus*, 812 F.2d at 1394-95. There must be some action on the part of the government, either express or implied, to lead appellant to believe its claims will not be extinguished by execution of the general release. *JDV Construction*, 89-3 BCA ¶ 22,012; *Able Products*, 80-2 BCA ¶ 14,733. Although ambiguous, there is some evidence that the government employee that directed appellant in preparing and submitting the invoices also did not consider the releases to bar future claims; Mr. Johnson's testimony could be construed to support the view that he did not consider the releases to bar claims but instead saw them only as a payment mechanism (finding 33). Assuming arguendo that was the case, it still does not support the conclusion that there was a pre-release understanding between the parties. There is no evidence Mr. Johnson's beliefs were ever communicated to appellant or that there were any other actions taken by the government that would lead appellant to reasonably conclude its claims would not be barred by the release.

Therefore, we conclude appellant has failed to prove there was a pre-release understanding between the parties excepting its claims from the general releases.

Appellant points out and our findings establish that 7 of the 30 payment invoices were not final payment invoices but were requests for interim payment (app. br. at 7-9, 18-20; finding 29). This fact, whether the invoices were submitted for interim or final payment, does not change the result in these appeals. Each of the interim payment invoices contained a general unqualified release, which would have released the government from all claims arising before execution of the release (findings 26, 29). The facts giving rise to both appellant's acceleration claim (ASBCA No. 58432) and transportation and storage claim (ASBCA No. 58441) arose early in performance of the TOs. Consequently, both claims would fall within the scope of the general releases and, thus be barred. Regarding the access to buildings claim (ASBCA No. 58442), only two of the interim invoices are associated with this appeal, TO 9 (Bldg. 633) and TO 23 (Bldg. 632) (finding 29). The facts giving rise to this appeal continued throughout performance at these buildings. However, the record indicates the releases associated with these two invoices were executed on 30 December 2005, after completion of work on the buildings (findings 26, 29). Consequently, any claims would be barred by the releases accompanying the invoices for payment.

## CONCLUSION

For the reasons stated, these appeals are denied.

Dated:  1 March 2016

JOHN J. THRASHER
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA Nos. 58432, 58441, 58442, Appeals of Clean by Lucy, Inc., rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals
